United States District Court
For the Northern District of California

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    JONATHAN M. TORRES,                     )    No. C 07-00440 SBA (pr)
                                              )
5              Petitioner,                    )    **ORDER DENYING PETITION FOR**
     v.                                       )    **WRIT OF HABEAS CORPUS**
6                                             )
     JAMES YATES,                             )
7                                             )
               Respondent.                    )
8    _____)

9

10                            **INTRODUCTION**

11        This matter is now before the Court for consideration of Petitioner's pro se petition for a writ

12   of habeas corpus under 28 U.S.C. § 2254 challenging his 2004 conviction in Santa Clara County

13   Superior Court.  Respondent James Yates, Warden of Pleasant Valley State Prison, opposes the

14   petition.  Petitioner filed a traverse.  For the reasons discussed below, the petition is DENIED as to

15   all claims.

16                            **BACKGROUND**

17   **I.    Case History**

18        On March 23, 2004, a jury in Santa Clara County Superior Court convicted Petitioner, along

19   with his co-defendant Joseph James Guerrero, of second-degree robbery (Cal. Penal Code §§ 211-

20   212.5(c) [counts 1 and 2]), felony false imprisonment (Cal. Penal Code §§ 236-237 [count3]) and

21   concealing or withholding stolen property (Cal. Penal Code § 496(a) [count 4]).  The jury also found

22   that petitioner and Guerrero personally used a handgun in the commission of counts one, two, and

23   three.  The trial court sentenced Petitioner to seventeen years and four months in state prison and

24   Guerrero to twelve years in state prison.

25        On appeal, the California Court of Appeal affirmed the convictions and sentences of both

26   Petitioner and Guerrero in an unpublished opinion on July 28, 2005.  Petitioner filed a petition for

27   review in the California Supreme Court which was denied without prejudice on November 16, 2005.

28   Petitioner filed a petition for a writ of habeas corpus in Santa Clara Superior Court, which was

     denied on March 2, 2007.  He then filed a petition for a writ of habeas corpus in the California Court

of Appeal, Sixth Appellate District, which was denied without prejudice on February 1, 2007. Thereafter, he filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on July 18, 2007.   Petitioner filed an additional writ of habeas corpus in the California Supreme Court, which was denied on October 17, 2007.

The instant petition was filed on January 23, 2007.  The Court issued an order to show cause on August 14, 2007.  Respondent filed a motion to dismiss on September 13, 2007.  Petitioner filed an opposition on October 3, 2007.  The Court denied Respondent's motion to dismiss and reinstated the order to show cause on June 9, 2008.  Respondent filed an answer and memorandum of points and authorities on July 29, 2008.  After receiving an extension of time, Petitioner filed a traverse on August 21, 2009.

## II.   **Statement of Facts**

The following facts are taken from the opinion of the California Court of Appeal.

At approximately 5:00 p.m. on Saturday, May 24, 2003, Maria Valencia and Orfedalia Naranjo were working at Trade Right Market (Trade Right) at 1555 Alum Rock in San Jose. Valencia, the owner of Trade Right, was training Naranjo to take over on the weekends, and it was Naranjo's first day training on the cash register. Robert Persekian rented space from Valencia for his business, and he was at work on his computer near the store's cash register. While the women were waiting on a client and Valencia was showing Naranjo how to "operate the cash register," two men entered Trade Right and pointed guns at both women. Both men wore face coverings. The man who came in first was larger, heavier, and had darker skin than his companion. One of the men yelled, "Don't fucking move. Get to the floor." The women froze, and defendants pointed the guns at their heads. One robber went to the cash register and pulled out a moneybag that contained between $100 and $300 in cash as well as prepaid phone cards that were worth approximately $2,000. Both robbers then left.

Valencia called 911 once the robbers had gone. She testified that both she and Persekian spoke to the 911 operator while they were still frightened. Valencia told the operator "[t]wo black men" had entered Trade Right with guns and had taken prepaid phone cards and "stuff." Persekian then told the operator both men were "black" and that one was about 6 feet tall and 200 pounds while the other was about 5 feet 9 inches and 160 pounds. Persekian also told the operator that the larger man was wearing a red shirt, both men were wearing jeans, and that the robbers had fled on Alum Rock toward King Road in a "Ford Mercury gold color."

Shortly before 5:00 p.m., Javier Trinidad Sandovag [Trinidad], Valencia's cousin who owned the store next to Trade Right, was throwing out boxes when he saw a car drive into the lot behind his store. The prosecution evidence established that defendant Guerrero, who was 6 feet 2 inches, and defendant Torres, who was 5 feet 7 inches, were the two men inside that car. Defendants aroused Trinidad's suspicions because of "the way" they looked at him when they entered the lot. Trinidad went inside but watched defendants from a back corner window since he had been robbed the previous November

2

United States District Court

For the Northern District of California

and was concerned about his truck that was parked in the lot. When Trinidad walked outside of his store and saw defendants again, he noticed that their car had been moved to the street corner. He saw Guerrero walk to the corner and around the building, and he saw Guerrero wave to Torres. Trinidad described Guerrero as a heavy-set male about 6 feet tall with a thin mustache and a rounded face; he added that Guerrero had darker skin than Torres and appeared to be either Samoan or Hispanic. Trinidad described Torres, the driver, as about 5 feet 8 inches tall with lighter skin. From the front of his store, Trinidad noticed that Guerrero and Torres each had his right hand inside his pocket and that, although the weather was like "summer," they had covered their heads with beanies or "knit caps" they had not been wearing earlier. While Trinidad was about eight feet from the men, he nervously pushed 911 on his cell phone, but he later gathered that he did not press the send button. When Guerrero and Torres came almost "[f]ace to face" with Trinidad, they stopped, and Torres said, "Hey, let's get out of here, dude." The two turned around, entered the car they had left parked with its engine running, and Torres drove them away. Trinidad noticed that the car defendants were in was a gold-colored Taurus with a damaged left fender, that it had no front license plate, and that its rear plate read "CPINEDA."

Trinidad stood outside his store for between 20 and 30 minutes. He then went inside his store to answer a telephone call. When he came back outside and saw police in front of Trade Right, he reported to them what he had seen and described the car and license plate. On the issue of credibility, he admitted he had prior convictions for transporting drugs and for possession of drugs with the intent to sell.

On May 24, Guerrero's father Jess and his stepmother Elizabeth lived at 480 Lockridge in San Jose. That day, the defendants came to their home in a Ford Taurus that belonged to Guerrero's girlfriend, Georgiana Tinoco. Later that evening, Jess drove defendants to a barbecue.

Shortly after the robbery, San Jose Police Officer Ron Bayes arrived at Trade Right and was informed by witnesses that a gold Taurus with a "CPINEDA" license plate had been in the area near the time of the robbery. At 6:30 p.m. that same day, Bayes was handling an unrelated call in an area near 1717 Castle Brook Court, which is a few houses from 480 Lockridge and about two miles from Trade Right, when he saw a gold Taurus parked in front 1717 Castle Brook with a "CPINEDA" license plate. Officer Gustavo Perez was assigned to watch the Taurus; he had it towed when no one had approached the Taurus by 12:15 a.m. on May 25.

Dawn Pagan testified that, during the evening of May 24, Jess dropped Torres and Guerrero off at her home at 1035 McKay in San Jose. Pagan was surprised to see Torres and his friend "Joe" Guerrero since Torres had broken up with her about six months earlier. She testified that defendants told her that they had been at "Joe's house" before coming to her apartment, that they had left because "the police were looking for them," and that Jess had dropped them off at her place. "[E]verybody" drank beer and used methamphetamine into the early morning hours. Pagan overheard both defendants saying "something about a gun" in the car, that "they were freaking out because [the car] was towed by the police," and "the cops [finding] out about our string." Defendants spent the night at Pagan's house. The next morning, Pagan heard Guerrero call his parents' home and tell Jess that he was coming over to get a bag. Guerrero then asked Pagan to pick up a "black bag" for him. Pagan then drove to Jess and Elizabeth's home and spoke with Jess. Elizabeth, who was standing nearby, said she would not give Pagan the bag because she was going to take it to the police. As Pagan drove home, she noticed that she was being followed. When she told defendants that she thought the police had followed her back to her apartment, defendants left "[r]ight away." With respect to her credibility,

3

Pagan admitted that she had a prior conviction for petty theft.

Officer David Tindall had been conducting surveillance at 480 Lockridge when Pagan arrived there at approximately 9:30 a.m. on May 25. Officers did follow Pagan from Lockridge to 1035 McKay, and they then conducted surveillance for several hours outside the McKay address before going inside.

In the meantime, Elizabeth took the phone cards from the bag and brought them to the police station. She left when no one responded to her request to speak to someone in the burglary or robbery department. She turned over the phone cards and the moneybag to police when they came to her home, and the owner of Trade Right later identified the black bank bag and the phone cards as resembling the items taken from her store.

Sergeant John Tepoorten interviewed Pagan at her house on May 25. Pagan reported that Torres and "Joe" had come to her home between 6:00 and 7:00 p.m. She told the sergeant that Joe had a large birthmark on his face and that the police had towed the car belonging to his girlfriend. Pagan told the sergeant that Torres and Joe had been freaking out because there were guns in that car and they were nervous about "cops finding out about our string." She said Torres and Joe had fled the home of Joe's parents when police responded to the area and had received a ride from Jess to her house.

When Officer Daniel Ichige searched the inside of the Taurus with rear license plate "CPINEDA," he found two knit caps with openings cut for eyes, two working Luger pistols, a Luger magazine with bullets, walkie-talkies, a scanner, latex gloves, a brown wig, license plate number 3DYX392, and clothing that included a red size XL sweatshirt and a red size 5XL T-shirt. Ichige also found items in the names of Torres, Guerrero, and the brother of Guerrero's girlfriend. Ichige noted that the Taurus did not have a license plate in the front.

The parties stipulated that, after the robbery, latent prints were lifted on May 24 from Trade Right's cash register and that latent prints later were lifted from some of the phone cards found in the bag, from license plates 3DYX392 and CPINEDA, from a pistol, and from a magazine. The police fingerprint expert who examined the latent prints and compared them with known prints of defendants testified that he found a match between Guerrero and latent prints lifted from the back of license plates 3DYX392 and CPINEDA, from two items found inside the Taurus, and from four locations on the exterior of the Taurus. The expert also found a match between Torres and a latent print lifted from the exterior of the Taurus.

The criminalist who performed DNA testing on clippings from above and below the eye openings of the caps found inside the Taurus determined Guerrero was the major source of DNA on one cap and Torres was the major source of DNA on the other.

At the trial, the owner of Trade Right identified the caps found in the Taurus as resembling those worn by the robbers. At the time of trial, she was selling Trade Right because she had remained "scared after what happened" during the robbery. She testified that, after the robbery, Naranjo immediately stopped working at Trade Right and Persekian moved out of town.

Georgiana Tinoco testified she had owned a 1994 Taurus with license plate 3DYX392 in 2003, she had been dating Guerrero at the time, he was living with her, and he did not always come home. Tinoco said Guerrero had taken her Taurus with her permission either on May 24 or shortly before then. She said that various items found in her Taurus did not belong to her, including the caps, the walkie-talkies and scanner, the guns and

4

ammunition, and license plate CPINEDA.

(Resp't. Ex. 1 at 2-7.)

**DISCUSSION**

I.      **Legal Standard**

    A.      **Standard of Review for State Court Decisions**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

        1.      **Section 2254(d)(1)**

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of  clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th

1    Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

2                    **a.    Clearly Established Federal Law**

3         "Clearly established federal law, as determined by the Supreme Court of the United States"

4    refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of

5    the relevant state-court decision." Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the

6    source of clearly established law to [the Supreme] Court's jurisprudence." Id.  "A federal court may

7    not overrule a state court for simply holding a view different from its own, when the precedent from

8    [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is

9    no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the

10   state court's decision cannot be contrary to, or an unreasonable application of, clearly-established

11   federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

12        The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

13   constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the

14   rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391.  There are,

15   however, areas in which the Supreme Court has not established a clear or consistent path for courts

16   to follow in determining whether a particular event violates a constitutional right; in such an area, it

17   may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S.

18   at 64-65.  When only the general principle is clearly established, it is the only law amenable to the

19   "contrary to" or "unreasonable application of" framework.  See id. at 73.

20

21        Circuit decisions may still be relevant as persuasive authority to determine whether a

22   particular state court holding is an "unreasonable application" of Supreme Court precedent or to

23   assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert.

24   denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

25                    **b.    "Contrary to"**

26        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

27   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

28   state court decides a case differently than [the Supreme] Court has on a set of materially

6

United States District Court
For the Northern District of California

indistinguishable facts." <u>Williams</u>, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of § 2254(d).  <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

### c.      "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 412-13.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard.  <u>Andrade</u>, 538 U.S. at 75-76 (rejecting <u>Van Tran</u>'s use of "clear error" standard); <u>Clark</u>, 331 F.3d at 1067-69 (acknowledging the overruling of <u>Van Tran</u> on this point).  After <u>Andrade</u>,

> [t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

7

**United States District Court**
For the Northern District of California

Id.  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

## 2. Sections 2254(d)(2), 2254(e)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings

survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." <u>Taylor</u>, 366 F.2d at 1000.

## II.      <u>Exhaustion</u>

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. <u>See</u> 28 U.S.C. § 2254(b), (c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in his petition. Specifically, Petitioner exhausted his first three claims in state habeas petitions, and he exhausted his fourth and fifth claims on direct appeal.

## III.     <u>Legal Claims</u>

Petitioner raises five claims: (1) Petitioner  received ineffective assistance of counsel because defense counsel was aware of the strength of the evidence against Petitioner and yet made him believe that he could win at trial; (2) Petitioner received ineffective assistance of counsel because defense counsel failed to investigate prosecution witnesses; (3) the prosecutor withheld evidence from the defense regarding drug investigations of prosecution witnesses; (4) the trial court's admission of Persekian's statements to the 911 dispatcher violated his confrontation right; and (5) the trial judge sentenced Petitioner to state prison for a longer term than Guerrero because Petitioner went to trial.

### 1.      <u>Ineffective Assistance of Counsel</u>

As noted above, Petitioner's first two claims assert that he received ineffective assistance of counsel.  First, Petitioner claims that defense counsel was aware of the strength of the evidence against Petitioner and yet made him believe that he could win at trial.  Second, Petitioner claims that defense counsel failed to investigate prosecution witnesses.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.   <u>Standard of Review</u>

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. <u>Id.</u> In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under professional norms. <u>Id.</u> at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 694. Where the defendant is challenging his conviction, the appropriate question in determining prejudice is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" <u>Luna v. Cambra</u>, 306 F.3d 954, 961 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 695).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. <u>See</u> <u>Strickland</u>, 466 U.S. at 697; <u>Williams v. Calderon</u>, 52 F.3d 1465, 1470, n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

Petitioner can make out a claim of ineffective assistance of counsel only by pointing to specific errors made by trial counsel. <u>See</u> <u>United States v. Cronic</u>, 466 U.S. 648, 666 (1984). Petitioner must identify actual errors or omissions by counsel that a conscientious advocate would not have made, and show that they suffered prejudice from those errors. <u>See</u> <u>United States v. Ross</u>, 338 F.3d 1054, 1056-57 (9th Cir. 2003). Furthermore, conclusory claims unsupported by specific facts are not entitled to habeas relief. <u>Jones v. Gomez</u>, 66 F.3d 199, 204-205 (9th Cir. 1995).

10

**United States District Court**
For the Northern District of California

1

### B.  <u>Advice of Counsel Regarding Going to Trial</u>

2

Petitioner claims that defense counsel, "after reading the evidence came to him and talked

3

about a plea bargain, but made the petitioner believe counsel had the ability to over come [sic] the

4

evidence." (Pet. at 9.)  Here, the Santa Clara County Superior Court denied Petitioner's claim

5

because he failed to provide the evidence necessary to support his claim.  (Resp't. Ex. 4.)[1]

6

Petitioner's claim fails because he has not shown prejudice.  To establish prejudice from

7

counsel's advice to go to trial instead of accepting a plea offer, petitioner must show that there is a

8

reasonable probability that, but for counsel's errors, he would have pleaded guilty and would not

9

have insisted on going to trial.  <u>Hill v. Lockhart</u>, 474 U.S. 52, 57-59 (1985).  Petitioner has not

10

described the terms of any plea offer from the prosecution or even alleged that the prosecution made

11

a plea offer at all.  Absent any plea offer, he cannot show that he ever had the possibility of

12

obtaining a more favorable outcome by pleading guilty.  Furthermore, Petitioner has not asserted

13

that had defense counsel advised him differently, he would have pleaded guilty and would not have

14

insisted on going to trial.  Because Petitioner has not shown prejudice, the state court's rejection of

15

the claim was neither contrary to nor an unreasonable application of federal law.

16

17

Petitioner also asserts that defense counsel failed to put on any defense.  However, the record

18

shows that defense counsel did put on a defense of mistaken identity when he cross-examined the

19

prosecution witnesses, and during opening and closing argument.  While defense counsel did not call

20

witnesses for the defense, in order to succeed on a claim that counsel was ineffective on this basis,

21

Petitioner must identify the particular witness, provide the testimony that the witness would have

22

given, show that the witness was likely to have been available to testify and would have given the

23

proffered favorable testimony, and establish that such testimony created a reasonable probability that

24

the jury would have reached a verdict more favorable to the petitioner.  <u>See</u> <u>Alcala v. Woodford</u>, 334

25

F.3d 862, 872-73 (2003).  Petitioner has not even alleged that any favorable witnesses existed, let

26

27

28

---

[1]When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).  Here, the Superior Court was the only state court to issue an explained opinion on petitioner's first three claims.

alone identified them or demonstrated what evidence they would have presented.  Accordingly, Petitioner has not shown ineffective assistance of counsel in this regard.

### C.     Defense Counsel's Investigation of Witnesses

Petitioner claims that defense counsel failed to investigate the backgrounds of "several key prosecution witnesses" whom he alleges were involved in a drug investigation.  (Pet. at 11.) Petitioner explains that "the defense was aware of a series of drug arrests and investigations regarding the owner and other family members" near the store.  Id.  Petitioner  also explains that defense counsel failed to investigate witness Pagan's background in order to impeach her.  Id. at 13. The Santa Clara County Superior Court denied Petitioner's claim because he failed to provide the necessary evidence to support his claim.  (Resp't. Ex. 4.)

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691. However, "the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed."  Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995) (citations and quotations omitted).  To succeed on a claim of failure to investigate, Petitioner must show what additional information would be gained by the discovery he now claims was necessary.  Bragg v. Galaza, 242 F.3d 1082 (9th Cir.), amended, 253 F.3d 1150 (9th Cir.  2001).  In addition, failure to investigate claims must be considered in light of the strength of the government's evidence against petitioner.  Id.

Here, Petitioner says that defense counsel already knew about the criminal history of Valencia's family, and he does not allege what additional information defense counsel would have gained from further investigation.  Petitioner also fails to suggest what impeachment information could have been discovered about Pagan.  Petitioner cannot establish that counsel was ineffective, or that petitioner was prejudiced, without demonstrating what evidence counsel would have discovered by conducting further investigation.

Furthermore, even if further investigation would have uncovered information about the backgrounds of Trinidad, Valencia, and Pagan, the outcome of the trial would have likely been the

United States District Court

For the Northern District of California

1  same.  The government's case against Petitioner was strong.  Soon after the robbery, police found the

2  gold Ford Taurus with the license plate CPINEDA about two miles from the Trade Right Market,

3  near Guerrero's parents' house.  (Resp't. Ex. 8, Reporter's Transcript ("RT"), at 307, 308, 226-28.)

4  Guerrero and Petitioner went to Guerrero's parents house soon after the time of the robbery.  (RT at

5  226-27.)  Guerrero's parents found the moneybag containing phone cards in their house after

6  Guerrero and Petitioner left.  (RT at 239.)  When Officer Ichige searched the Taurus, he found two

7  knit caps with openings cut for eyes, two pistols, bullets for the pistols, a license plate with the

8  number 3DYX392, and items in the names of Petitioner and Guerrero.  (RT at 107-113, 121, 127,

9  131.)  Guerrero's fingerprints were found on both license plates, two items found in the gold Ford

10  Taurus, and the exterior of the Taurus.  (RT at 322-24, 328, 332-36.)  Petitioner's fingerprints were

11  found on the exterior of the Taurus as well.  (RT at 335-36.)  Finally, a forensic expert found

12  Petitioner's DNA on one of the knit caps found in the Taurus and Guerrero's DNA on the other.

13  (RT at 371.)  Thus, even if defense counsel could have discovered evidence impeaching Valencia,

14  Trinidad, and Pagan, there was sufficient compelling evidence against Petitioner apart from their

15  testimony that he would likely have been convicted.[2]

16  
17       In light of the compelling evidence against Petitioner and his failure to state what additional

18  helpful  information would have been discovered with further investigation, Petitioner has not shown

19  that counsel was ineffective or that Petitioner was prejudiced by any failure to investigate.  Thus, the

20  state court's rejection of the claim was neither contrary to nor an unreasonable application of federal

21  law.

22  _____

23       [2]Petitioner makes two additional assertions.  First, he asserts that defense counsel failed to
    challenge Trinidad's testimony.  The record establishes that this was not the case – defense counsel

24  cross examined and re-cross examined Trinidad, challenging his ability to observe Petitioner and his
    identification of Petitioner.  Second, Petitioner claims in conclusory fashion that defense counsel did

25  not want to properly represent Petitioner because defense counsel was not being paid, and instead he
    wanted to go to trial in order to try new trial tactics and to obtain favor with the prosecutor's office.

26  Even if Petitioner could establish the truth of any of these allegations, without a showing of
    prejudice from counsel's performance, asserting that counsel had a conflict of interest does not

27  establish a Sixth Amendment violation.  See  Bragg v. Galaza, 242 F.3d 1082, (9th Cir.), amended,
    253 F.3d 1150 (9th Cir. 2001).  For the reasons discussed above, Petitioner has not shown prejudice

28  resulting from defense counsel's performance.

**United States District Court**
For the Northern District of California

2.        __Prosecutor's Withholding of Evidence__

Petitioner claims that "the prosecutor withheld and suppressed evidence regarding an investigation of key state witnesses who were suspected of running a drug operation" and further explains that "the prosecutor was aware of the prior conviction by Trinidad because of pre-trial investigations which also revealed an on going [sic] drug investigation which involved the distribution of drugs from the Trade Right Market." (Pet. at 14.)  Petitioner alleges that the prosecutor "intentionally withheld this information from the defense because of an unspoken agreement that defense counsel would deliver the petitioner without a fight to be convicted." __Id.__ The Santa Clara County Superior Court denied Petitioner's claim because he failed to provide the necessary evidence to support his claim.  (Resp't. Ex. 4.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  __See__ __Smith v. Phillips__, 455 U.S. 209, 219 (1982).  If a defendant so requests, the government has an obligation to surrender favorable evidence that is "material either to guilt or to punishment."  __Brady v. Maryland__, 373 U.S. 83, 87 (1963).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  Put differently, to establish a __Brady__ violation, the defendant must show that exculpatory or impeaching evidence was suppressed by the state, either willfully or inadvertently, resulting in prejudice.  __Morris v. Ylst__, 447 F.3d 735, 741 (9th Cir. 2006).  The standard on habeas review is whether there is "any reasonable likelihood" that the evidence could have affected the jury's judgment.  __United States v. Agurs__, 427 U.S. 97, 103 (1976).  Furthermore, conclusory claims unsupported by specific facts are not entitled to habeas relief.  __Jones v. Gomez__, 66 F.3d 199, 204-205 (1995).

Here, Petitioner has made no more than a bald assertion that the prosecutor withheld information about prosecution witnesses.  In his prior claim, Petitioner alleges that defense counsel already knew about the drug trafficking investigation of Valencia and her family, which contradicts any claim that the prosecutor withheld this information from the defense.  Furthermore, the prosecutor elicited Trinidad's prior conviction on direct examination and there is no evidence that

the prosecutor withheld this information from Petitioner.  Finally, Petitioner has not pointed to any evidence of an "unspoken agreement" between the prosecution and defense counsel and no such evidence is apparent from the record.[3]

In any event, Petitioner has not shown any reasonable likelihood that the evidence allegedly withheld could have affected the jury's judgment and none is apparent from the record.  Here, Trinidad's prior conviction came out on direct examination.  Since the jury ultimately heard this information, there's no reasonable likelihood that the prosecution's failure to disclose it to defense counsel would have changed the jury's judgment.  It is also unlikely that evidence of a Trade Right drug investigation would have led the jury to a different judgment.  Trade Right is just as likely to have been robbed regardless of whether or not it was under an unrelated drug investigation.  More importantly, for the reasons explained in the prior section, the government's case against Petitioner, even apart from the testimony of Valencia, Trinidad and Pagan, was strong.  Because Petitioner has not shown a reasonable likelihood that the prosecutor's suppression affected the jury's judgment, the state court's rejection of the claim was neither contrary to nor an unreasonable application of federal law.

### 3.   **Confrontation Right**

Petitioner asserts that the trial court's admission of the portion of the 911 call including Persekian's statements to the 911 dispatcher violated his confrontation right because Persekian's statements were testimonial and Persekian was unavailable for trial.  Petitioner specifically challenges Persekian's responses to the dispatcher's questions regarding the physical description of the robbers, the direction the robbers headed once they left the store, the license plate number of the getaway car and the number of people in it, as well as a description of the car.

The California Court of Appeal explained the facts regarding Persekian's statements:

> During trial, the prosecution played the audiotape of the 911 call in which Valencia told the 911 operator that there had been a robbery of Trade Right and that "two

---

[3]Moreover, this conclusory assertion only undermines his other contentions insofar as any such agreement would only make the prosecution more likely to share evidence with defense counsel.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

black men enter and steal with a gun in their hand. And they point at us and they run with some pre-paid phone cards and stuff like that." The prosecution also played the portion of that audiotape during which Persekian provided the 911 operator with physical descriptions of the robbers and said they had fled towards King Road in a "Ford Mercury gold color." Spontaneously, Persekian said the one robber was "about six feet, maybe around 200 pounds. The other one was a little bit skinnier. I would say 5 9", around 160 pounds." He also spontaneously brought up that the robbers drove "down 24th and Santa Clara" in a "Ford Mercury gold color." In response to questions asked by the operator, Persekian said that the robbers were wearing ski masks, that they were black, that the taller one was wearing a red shirt and both were wearing jeans, that they were heading towards King Road, and that there were only two people in the car.

Exh. 1 at 11.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." See Crawford v. Washington, 541 U.S. 36, 51 (2004). "Testimonial" includes "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52.

The Supreme Court has since determined more precisely when police interrogations produce testimony. See Davis v. Washington, 547 U.S. 813, 821-23 (2006). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id. An interrogation to determine the need for the emergency can evolve into testimonial statements once that purpose has been achieved. Davis, 547 U.S. at 827-28. In Davis, once the 911 operator gained the information needed to address the exigency of the moment and after Davis drove away from the premises, the emergency appeared to have ended. Id. The operator then proceeded to further question the victim, and from that point on, any elicited statements may have been testimonial. Id.

However, at least two circuits have found that an emergency is ongoing, and a 911 conversation has not evolved into testimony, while a suspect is still at large with a weapon. See U.S. v. Dodds, 569 F.3d 336, 340-341 (7th Cir. 2009); U.S. v. Proctor, 505 F.3d 366, 371-372 (5th Cir.

16

2007).  In Dodds, the 911 caller's description of the defendant was nontestimonial because it was given to help the police resolve an ongoing emergency where the caller reported "shots fired" and police had an urgent need to identify the person with the gun.  Dodds, 569 F.3d at 340-41.  In Proctor, the caller's statements to the 911 dispatcher were nontestimonial because the caller called just after the petitioner ran off with a gun and the information was given to help police deal appropriately with the situation that was unfolding.  Proctor, 505 F.3d at 371-72.  The caller described what had just happened, the physical appearance of petitioner, his criminal history, and the possibility that he might be under the influence of drugs.  Id.  Petitioner argued that the emergency had already passed, however, the court held that the fact that a felon, possibly high on cocaine, had run off with a loaded weapon created an ongoing emergency.  Id.

Here, when Persekian explained the circumstances of the crime to the police dispatcher right after the robbery occurred, the emergency was still ongoing because the robbers were still armed and fleeing the scene of a crime.  Persekian's statements to the 911 dispatcher regarding the physical description of the robbers, the direction the robbers headed once they left the store, the license plate number of the car, the description of the car, and the number of people in it were all relevant to helping police stop the armed and fleeing robbers.  Thus, like in Dodds and Proctor, Persekian's statements to the dispatcher were nontestimonial under Davis because they were made under circumstances objectively indicating that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency.

Petitioner cites two state cases to show that 911 calls are per se testimonial.  People v. Cortes, 781 N.Y.S.2d 401 (2004); State v. Powers, 124 Wash. App. 92 (2004).  These state court opinions are not persuasive because they were decided in 2004, before the Supreme Court explained in Davis that 911 calls may be nontestimonial.  See Davis, 547 U.S. at 821-23.

Because Persekian's statements to the 911 dispatcher were nontestimonial, their admission did not violate Petitioner's rights under the Confrontation Clause.  Therefore, the state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law.

**4.      Exercise of Right to Jury Trial**

17

United States District Court
For the Northern District of California

1    Petitioner claims that the trial court punished him for exercising his right to jury trial by

2    sentencing him to a term five years and four months longer than Guerrero, who pled guilty.

3    The trial court explained its decision to give Guerrero a lighter sentence than Petitioner by

4    saying that Guerrero, "prior to trial indicated an agreement to accept a plea agreement by the District

5    Attorney, and at the last sentencing hearing, the District Attorney recommended that [Guerrero] be

6    sentenced to 12 years.  In light of that and a show of remorse, my intention is to go along with that

7    agreement."  (RT at 495-96.)

8    The California Court of Appeal rejected Petitioner's claim as follows:

9    The fact that defendant Guerrero voluntarily acknowledged wrongdoing at an early
10   stage of the criminal process by expressing a willingness to plead guilty before the
     preliminary hearing and expressed a willingness to "spare any of the victims having
11   to testify at all" is an appropriately considered circumstance in mitigation (Cal. Rules
     of Court, rule 4.423(b)(3)), and the prosecutor properly viewed the fact that Guerrero
12   "was willing to plead as charged" to spare the victims the need to testify as a sign of
     remorse. Torres was not being punished for going to trial; rather, Guerrero alone was
13   given a mitigated sentence because he acknowledged guilt at an early stage of the
     criminal process, he wanted to spare the victims from having to testify, and he
14   therefore appeared to be remorseful for his criminal conduct. These were
     circumstances individual to Guerrero that did not apply to Torres. We are not
15   persuaded by the claim of Torres that he showed "remorse" by writing a letter to the
     trial court that "acknowledged that the judge had a 'job to do' and whatever the
16   decision of the court he asked that it 'seek the kingdom of God first, May God bless
     you.' " The fact that the father of Torres wrote a letter to the court in which he said
17   that his son was "guilty of bad association and I know from talking with him that he
     wished he had not" similarly does not constitute an expression of remorse from
18   defendant Torres.

19   (Resp't. Ex. 1.)

20   Vindictiveness in sentencing violates due process.  North Carolina v. Pearce, 295 U.S. 711

21   (1969).  Because it is extremely difficult to prove the existence of a retaliatory motive in an

22   individual case, vindictiveness is presumed  whenever a judge imposes a more severe sentence upon

23   defendant after a new trial, the reasons for the enhancement do not "affirmatively appear," and there

24   is a reasonable likelihood that the increase in the sentence is the product of actual vindictiveness.

25   Nulph v. Cook, 333 F.3d 1052, 1057-58 (9th Cir. 2003).

26   Here, the reason for Guerrero's lighter sentence, i.e., that he showed remorse, appears

27   affirmatively in the record.  Under the California Rules of Court, the fact that "[t]he defendant

28   voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal crosses," is a

United States District Court

For the Northern District of California

mitigating circumstance for the court's consideration.  Cal. Rules of Court 4.423(b)(3).  Guerrero showed remorse by pleading guilty to the charges early in the case in order to spare the witnesses from testifying.  Petitioner did not.  Petitioner's sentence was not lengthened and it was shorter than the term of 19 years and 4 months that had been recommended by the probation department.  Rather, Guerrero's sentence was merely mitigated because of a showing of remorse.  Because a proper reason for Guerrero's mitigated sentence appears on the record, the trial court's sentencing decision cannot be presumed to be vindictive, and petitioner has not otherwise pointed to any indication of vindictiveness in the record.  The state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law.

## IV.    Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing for his second and third claim.  Regarding his second claim, petitioner requests a hearing "to allow cross examination of the witnesses contained in this contention."  (Pet. at 13.)  Regarding his third claim, Petitioner requests a hearing "to determine what information was in the possession of the prosecutor prior or during petitioner's criminal trial regarding any State or Federal crime investigation that was being conducted during the time of the trial."  (Pet. at 15.)

The amendments contained in the AEDPA  impose an express limitation on the power of a federal court to grant an evidentiary hearing.  A district court may not hold an evidentiary hearing on a claim for which the petitioner failed to develop a factual basis in state court unless Petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

As explained above, regardless of what additional information counsel might have discovered or the prosecution might have disclosed about the criminal backgrounds of various

witnesses, the physical and other evidence against Petitioner was strong enough to make conviction likely.  Thus, Petitioner is far from showing, under 28 U.S.C. § 2254(e)(2)(B), that additional facts would establish that no reasonable factfinder could find him guilty beyond a reasonable doubt. Accordingly, Petitioner is not entitled to an evidentiary hearing on his claims.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 10/26/09

SAUNDRA BROWN ARMSTRONG
United States District Judge

**United States District Court**
For the Northern District of California

1
     UNITED STATES DISTRICT COURT

2   FOR THE

3   NORTHERN DISTRICT OF CALIFORNIA

4

5

6   ROGER R. WHITE,                          Case Number: CV09-01010 SBA

7              Plaintiff,                     **CERTIFICATE OF SERVICE**

8      v.

9   CALIFORNIA DEPT OF CORRECTIONS et al,

10             Defendant.

11   ———————————————————————/

12   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.
13

14   That on October 28, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
15   envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
     located in the Clerk's office.
16

17

18   Roger Russ White F10328
     Florence Correctional Center
19   P.O. Box 6200
     Florence, AZ 85232
20

21   Dated: October 28, 2009

22                                           Richard W. Wieking, Clerk
                                             By: LISA R CLARK, Deputy Clerk
23

24

25

26

27

28

21